**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0051n.06
Filed: January 15, 2008

**No. 06-5610**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

JOHNNY COWHERD,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　Petitioner-Appellant,　　　　　　)
　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　)　ON APPEAL FROM THE UNITED
　　　　　　　　　　　　　　　　　　　)　STATES DISTRICT COURT FOR THE
GEORGE MILLION,　　　　　　　　　　　)　EASTERN DISTRICT OF KENTUCKY
　　　　　　　　　　　　　　　　　　　)
　　　　Respondent-Appellee.　　　　　　)

Before:　DAUGHTREY and GILMAN, Circuit Judges; EDMUNDS,[*] District Judge.

PER CURIAM.　The petitioner, Johnny Cowherd, is an inmate in the Kentucky prison system, following his conviction in state court on two counts of rape, four counts of sodomy, and one count of second-degree burglary.　Faced with a resulting sentence of 104 years, he filed this action in federal district court, seeking issuance a writ of habeas corpus. In his habeas petition, Cowherd contended that the lengthy sentence was unconstitutionally disproportionate to the crimes he committed, that he was improperly subjected to multiple convictions and multiple punishments for the same offense, and that his trial attorney provided him with ineffective assistance of counsel.　The district court

---

[*]The Hon. Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

denied relief, and the petitioner now appeals that order. For the reasons set out below, we

affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The appellate record filed in this case does not include a copy of the transcript from

the petitioner's trial in state court. According to the brief that Cowherd filed in his direct

appeal to Kentucky's highest state court, however, the following facts were established at

trial:

> [Cowherd] came to stay with [Edna Galbreath and her boyfriend, Jeff,] six or
> seven times. . . . On April 6th[, 1993, while Jeff was in jail], after Galbreath
> had put her son[, DeAngelo,] in bed, [Cowherd] allegedly grabbed her from
> behind and put a box cutter to her throat. When she asked what he was
> doing, [Cowherd] allegedly replied, "Bitch, shut up." When she asked again,
> he allegedly replied, "Bitch, I will kill you and DeAngelo." He then threw her
> on the bed and tied her hands together with electrical cord he had cut off her
> curling iron. He next took off her pants and panties and cut off her shirt with
> the boxcutter. He tore off her brassiere. He then began to have sex with
> her. She tried to fight him off with her feet, but he cut the cord off a radio
> and tied her feet together. Then, according to Galbreath, the appellant rolled
> her over and put his penis in her rectum. He then put his penis in her mouth.
>
> Leaving her tied up in the bed, [Cowherd] went into the kitchen and cooked
> a hamburger. He then got money out of her purse and left the apartment.
> Before she could get loose, he returned. By then she had gotten her hands
> loose. She put her hands behind her back, but he saw that her hands were
> loose. He retied them with cord he cut off the fan. She then saw that
> [Cowherd] had bought some cocaine with her money. He smoked the
> cocaine. He blew the smoke into her face and tried to get her to inhale it.
> He then left the room and ate some potted meat. When he returned, he "did
> it all over again." He kept saying, "Bitch, you better make me feel good. You

better make me come." [Cowherd] also kept saying, "Jeff thinks he's got this. Jeff thinks he's got that." According to Galbreath, [Cowherd] then had vaginal and rectal intercourse with her. He then put his penis in her mouth. He told her to "lick his asshole and then his balls." He then told her to suck his penis again. Galbreath felt something coming out of her and saw that it was blood. She thought she was having a miscarriage. [Cowherd] saw the blood, but it didn't stop him.

[Cowherd] told Galbreath to go to sleep. He put on Jeff's sweatpants and began to walk around. He then got into bed beside her and went to sleep with the boxcutter in his hand.

Eventually, Galbreath escaped with DeAngelo from her own apartment and appeared, crying, at the door of a neighbor who contacted the police. At that time, the neighbor noticed that Galbreath's wrists were swollen and that "her mouth was 'swollen up real bad' from being gagged." When the police arrived at the neighbor's apartment, they "found [the] victim crying on the sofa," claiming to have been raped by Cowherd. The petitioner was subsequently apprehended by the police as he walked out of Galbreath's apartment, and an examination of the alleged crime scene revealed "cut wires and chairs in front of [the] door" and a boxcutter "in the bed under a pillow."

Additional trial testimony was offered by Dr. Anita Rogers, the emergency room physician who examined Galbreath based upon the victim's report that she had been raped. In his brief filed in the state supreme court, Cowherd summarized her testimony as follows:

According to Rogers, Galbreath had no bruises on her face or abdomen. She did see remnants of tape on Galbreath's left cheek. She saw no bruises on Galbreath's abdomen or back. She did observe abrasions and bruises

on Galbreath's ankles and wrists. According to Rogers, Galbreath had moderate swelling of her external genitalia. Their [sic] was no swelling of Galbreath's vagina. Sperm were present. There was a 1 centimeter laceration at the 6:00 o'clock area of Galbreath's rectum.

Cowherd testified on his own behalf and admitted to engaging in anal, oral, and vaginal sex with Galbreath. The petitioner insisted, however, that all such acts were consensual and that Galbreath was tied with cords only because the two adults agreed "to have sex with bondage."

The jury obviously credited the testimony of Galbreath and prosecution witnesses because it returned guilty verdicts on all counts. In accord with Kentucky practice, the jurors then offered their recommendation that the petitioner be sentenced to 16 years in prison on each of the two rapes (vaginal intercourse) and 18 years in prison on each of the four sodomy charges (anal and oral sex). They further recommended that all such sentences be served concurrently, yielding an effective prison sentence of 18 years. The trial judge disregarded that recommendation, however, and ordered the six sentences for sexual offenses to be served consecutively, resulting in a prison term of 104 years.

Cowherd's attempts to overturn his convictions and sentence on both direct appeal and through state post-conviction proceedings were unsuccessful, leading him to file this habeas action in federal district court. Initially, the district court dismissed that petition as untimely. In so ruling, the court recognized that the federal filing occurred within one year

of the dismissal of Cowherd's second state post-conviction petition. However, the court

held that because the state-court action had not included a federal constitutional claim, the

statute-of-limitations period created by the Antiterrorism and Effective Death Penalty Act

of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), was not tolled during the

pendency of the state post-conviction proceedings. A panel of this court affirmed that

dismissal. *See Cowherd v. Million*, No. 02-5499, 2003 WL 22114021 (6th Cir. Sept. 10,

2003). Subsequently, however, the Sixth Circuit, sitting *en banc*, vacated the panel

decision, granted rehearing, unanimously overruled the prior circuit precedent upon which

the original panel opinion had been based, and remanded the matter to the district court

for whatever proceedings were necessary in order to render a decision on the merits of

Cowherd's habeas corpus petition.

*See Cowherd v. Million,* 380 F.3d 909 (6th Cir. 2004).

Upon that remand, the matter was referred to a magistrate judge who issued a

report and recommendation suggesting that the 104-year prison sentence was not

constitutionally disproportionate to the crimes committed, that the multiple convictions did

not contravene double jeopardy principles, and that Cowherd's trial attorney did not provide

him with ineffective assistance of counsel. The district judge adopted the report and

recommendation in its entirety and denied the habeas corpus petition.

## II. **DISCUSSION**

### A. **Standard of Review**

Cowherd filed his petition for issuance of the writ of habeas corpus on June 11, 2001, well after the April 24, 1996, effective date of AEDPA. Consequently, the provisions of that act govern the resolution of this dispute. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Greer v. Mitchell*, 264 F.3d 663, 671 (6th Cir. 2001). Pursuant to the provisions of AEDPA, a federal court may not grant the writ unless the state court adjudication *on the merits* either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

As explained by the United States Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000):

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

In deciding whether a state court ruling involved an "unreasonable application" of federal law, a habeas court does not focus merely upon whether the state court decision was erroneous or incorrect; rather, a federal court may issue a writ of habeas corpus only if the state court's application of clearly-established federal law was objectively unreasonable. *See id.* at 409-11. Furthermore, "[t]his court reviews a district court's legal conclusions in a habeas proceeding *de novo* and its factual findings for clear error." *Greer*, 264 F.3d at 671 (citing *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999)).

## B. Constitutionality of 104-Year Sentence

Cowherd asserts that the 104-year prison sentence imposed upon him is so grossly disproportionate to the crimes he committed that it violates the proscription of the Eighth Amendment to the United States Constitution against cruel and unusual punishment. Specifically, he argues that the jury recommended a sentence of only 18 years and, thus, the state trial court's decision to run his six sentences consecutively so as to result in a sentence almost six times as long should be considered unreasonable, especially when viewed in relation to the sentence he could have received under the United States Sentencing Guidelines.

As we noted in *United States v. Marks*, 209 F.3d 577, 583 (6th Cir. 2000), however, "[t]he Supreme Court has determined that strict proportionality between a crime and its punishment is not required." (Citing *Harmelin v. Michigan*, 501 U.S. 957, 959-60 (1991)

(upholding a sentence of life without parole for possession of more than 650 grams of cocaine)). Instead, "[t]he Supreme Court has articulated a 'narrow proportionality principle' whereby it held that only 'extreme sentences that are grossly disproportionate to the crime are prohibited.'" *United States v. Flowal*, 163 F.3d 956, 963 (6th Cir. 1998) (quoting *Harmelin*, 501 U.S. at 995-97). In implementing this "narrow proportionality principle," the Sixth Circuit has recognized that "only an extreme disparity between crime and sentence offends the Eighth Amendment." *Marks*, 209 F.3d at 583.

No such "extreme disparity" exists in this situation. The petitioner readily admits that the jury's recommended sentence of 18 years for a rape or for sodomy would not be constitutionally suspect and falls within the applicable statutory sentencing ranges for the Class B felony offenses of rape in the first degree, *see* K.R.S. § 510.040(2), and sodomy in the first degree, *see* K.R.S. § 510.070(2). *See also* K.R.S. § 532.020(1)(c) (setting the penalty for Class B felonies at "[a]t least ten (10) but not more than twenty (20) years." In this case, Cowherd committed *six* separate acts that each constituted a prohibited sexual offense. *See, e.g.*, *Van Dyke v. Commonwealth*, 581 S.W.2d 563, 564 (Ky. 1979) (Kentucky legislature "intended to punish each separate act of rape or sodomy" where "evidence clearly discloses . . . three distinct offenses [of] rape, sodomy and a second rape when [the defendant] penetrated [the victim's] vagina to accomplish the first act of intercourse, penetrated her mouth to accomplish the act of sodomy, and thereafter penetrated her vagina to accomplish the second act of intercourse"). Unlike a situation in which one crime (for example, a rape) occurs during the pendency of another (for example,

a burglary), Cowherd serially committed the six violent offenses, even taking time after the commission of three of the offenses to cook and eat a meal before resuming his criminal acts. Moreover, each of the offenses was accompanied by physical restraint of the victim and by the threat of imminent use of force.

Had Cowherd imposed himself sexually upon the victim only briefly, only once, and under different circumstances before ceasing his violent, criminal activities, the lengthy, 104-year sentence might have been more difficult to justify. However, because the petitioner continued to restrain the victim by binding her hands and legs throughout the ordeal, because Cowherd maintained his dominant position in the encounter through the continued threat of deadly force, and because he refused to avail himself of the opportunity to end the assaults, but instead engaged in repeated prohibited acts, the state court determination that the 104-year prison sentence did not create "an extreme disparity between crime and sentence" was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.[1]

In his appellate brief, Cowherd also intimates that the lengthy prison term imposed upon him must be considered disproportionate to the crimes committed because, had he been punished under the federal sentencing guidelines, his incarceration would likely have lasted only 188 to 210 months. The Supreme Court has not, however, ever held or

---

[1]Further informing our conclusion that the 104-year sentence does not create "an extreme disparity between crime and sentence" is the representation of the warden's counsel at oral argument that Cowherd may be eligible for parole after serving 20 years of his sentence, and possibly as early as the spring of 2008.

suggested that state sentences and federal sentences must approximate each other in order to pass constitutional muster. Similarly, we recently rejected an argument that a *federal* sentence was unreasonable simply because it provided for a lengthier period of imprisonment than did applicable *state* sentencing principles. *See United States v. Malone*, 503 F.3d 481, 485-86 (6th Cir. 2007). Instead, the *Malone* panel joined other circuits in holding that the requirement in 18 U.S.C. § 3553(a)(6) that district judges consider unwarranted disparities in sentences refers only to disparities in sentences imposed upon federal defendants and not those that may exist between federal and state court sentences. *See id.* at 486. Because of the parallel, non-intersecting nature of the state and federal criminal justice systems and sentencing frameworks, the petitioner is not entitled to relief based on this argument.

## C. Double Jeopardy Considerations

In pertinent part, the Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offence [sic] to be twice put in jeopardy of life or limb." Petitioner Cowherd now contends, however, that he was in fact convicted multiple times for the same crime. In support of that argument, he notes that counts 1 and 2 of the indictment returned against him "are identical charges of first degree rape, and counts 3 through 6 are identical charges of first degree sodomy." In fact, both counts 1 and 2 did read identically, charging that "[o]n or about the 6th day of April, 1993, in Fayette County,

Kentucky, the above named Defendant committed first degree rape by forcing Edna Galbreath to engage in sexual intercourse by forcible compulsion." Similarly, counts 3, 4, 5, and 6 each charged that "[o]n or about the 6th day of April, 1993, in Fayette County, Kentucky, the above named Defendant committed first degree sodomy by engaging in deviate sexual intercourse with Edna Galbreath by forcible compulsion."

Such poorly-drafted indictments present at least two potential double jeopardy problems: (1) the possibility that insufficient specificity in the indictment would not enable Cowherd "to plead convictions or acquittals as a bar to future prosecutions"; and (2) the possibility that the undifferentiated counts would subject Cowherd "to double jeopardy in his initial trial by being punished multiple times for what may have been the same offense." *Valentine v. Konteh*, 395 F.3d 626, 634-35 (6th Cir. 2005). Unlike the situation presented in *Valentine*, however, the trial evidence adduced in the proceedings against Cowherd cured any defects in the indictment's drafting. In *Valentine*, the defendant was charged with 20 identically-worded counts of child rape and 20 identically-worded counts of felonious sexual penetration, all occurring at some unspecified time between March 1, 1995, and January 16, 1996. *See id.* at 628-29. At trial, however, "[t]he only evidence as to the number of offenses was provided by the testimony of the child victim, who described typical abuse scenarios and estimated the number of times the abusive offenses occurred, e.g., 'about 20,' 'about 15' or 'about 10' times." *Id.* at 628. Consequently, neither the defendant nor any reviewing court could ascertain for certain whether the resulting 40 convictions were in fact connected to 40 separate, proven crimes.

By contrast, petitioner Cowherd cannot now claim that he is unsure of the basis for his six sexual offense convictions. The trial testimony of the victim clearly delineated the sequence of events that occurred on April 6, 1993. According to Galbreath, Cowherd bound her, threatened her with a knife, and forced her to engage in vaginal, anal, and oral sex before pausing to cook and eat a meal, leave the premises, return, ingest illegal drugs, and then repeat the vaginal, anal, and oral sexual assaults. More importantly, Cowherd himself admitted to each of the charged activities but insisted that Galbreath was a willing participant in the acts.

The indictment, despite inartful drafting, nevertheless charges Cowherd with two counts of vaginal rape and four counts of sodomy. The only testimony at trial regarding the alleged crimes clearly indicated that the petitioner twice penetrated Galbreath's vagina with his penis against her will, twice penetrated her anus with his penis against her will, and twice forced his penis into her mouth against her will. Moreover, the jury convicted Cowherd of each of the two rape charges and of each of the four sodomy allegations. The confluence of the charges, the trial testimony, and the jury verdicts thus ensures both that Cowherd could successfully plead these convictions as a bar to any future prosecution based upon these acts, and that Cowherd was punished only for these six crimes and only once for each of the six offenses. The petitioner's double jeopardy challenge is thus without merit, and the district court appropriately concluded that the state court's treatment of this issue was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent relevant to the claim.

## D. Ineffective Assistance of Counsel Claim

In his final appellate issue, Cowherd submits that his trial attorney provided him with ineffective assistance of counsel by failing to investigate fully the petitioner's version of the events of April 6, 1993. Specifically, Cowherd argues that had his attorney attempted to locate witnesses to Galbreath's alleged prior drug use, or had he sought verification that the victim's fingerprints were on a crack pipe also used by the petitioner, counsel could have discredited the victim and provided support for the defense theory that Galbreath made baseless rape allegations in order to punish Cowherd for refusing to pay for the drugs the two individuals willingly consumed.

In addressing this claim of ineffective assistance of counsel, we must be guided by the now-familiar two-part test of *Strickland v. Washington*, 466 U.S. 668 (1984). As required by that analytical framework:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687.

In *Groseclose v. Bell*, 130 F.3d 1161, 1167 (6th Cir. 1997), in discussing the first prong of the *Strickland* analysis, we recognized that:

> The [Supreme] Court cautioned that in undertaking an ineffective-assistance review, "[j]udicial scrutiny of counsel's performance must be highly deferential," and must avoid the "second-guess[ing of] counsel's assistance . . ., [as] it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689 . . . . In order to avoid "the distorting effects of hindsight," a reviewing "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id.* (citation omitted).

Furthermore, in evaluating the prejudice suffered by a petitioner as a result of alleged ineffective assistance of counsel, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Indeed, "[v]irtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* (citation omitted). Rather, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Finally, in conducting this inquiry, we need not apply *Strickland*'s principles in a mechanical fashion. As the Supreme Court explained:

> [A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim

> on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

*Id.* at 697.

Just such a reverse treatment of the two prongs of the *Strickland* test is appropriate in this case. Even if Cowherd's counsel had established at trial that Galbreath had previously used illegal drugs *and* that her fingerprints were on the crack pipe found in the residence, such information still would not have established that the petitioner did not forcefully rape the victim on April 6, 1993. Any prior drug use by Galbreath was thus completely irrelevant to the question of whether she consented to the sexual acts Cowherd himself admitted performing. Because the alleged deficiencies in representation highlighted by the petitioner do not undermine confidence in the outcome of the proceedings, Cowherd is also not entitled to habeas relief on this ground.

### III. <u>CONCLUSION</u>

Because the decisions of the Kentucky courts in this matter were neither contrary to nor an unreasonable application of any clearly established federal law, as determined by the United States Supreme Court, petitioner Cowherd is not entitled to habeas corpus relief on any of the issues he now raises on appeal. We thus AFFIRM the district court's denial of Cowherd's habeas petition.